## SHERMAN OIL MILL v. NEFF.

(Court of Civil Appeals of Texas. Dallas. April 12, 1913. On Motion for Rehearing, May 10, 1913. On Motion for Rehearing and Additional Findings of Fact, June 7, 1913.)

1. MASTER AND SERVANT (§ 265*)—ACTION FOR INJURIES—BURDEN OF PROOF.

To fix the liability of a master for injuries to a servant, his negligence must not only be shown, but must be shown by affirmative evidence to have been the proximate cause of the injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 877–908, 955; Dec. Dig. § 265.*]

2. MASTER AND SERVANT (§§ 101, 102*)—MASTER'S LIABILITY—SAFE PLACE TO WORK.

It is the duty of the master to use ordinary care to provide his servant with a safe place in which to work and to provide safe appliances with which to perform his work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 135, 171, 174, 178–184, 192; Dec. Dig. §§ 101, 102.*]

3. MASTER AND SERVANT (§ 264*)—ACTION FOR INJURIES—PLEADING AND ISSUES.

Allegations, in a servant's action for injuries, that the belt operating gin stands in a cotton gin, through or behind which plaintiff reached, was old, defective, and unsafe, was negligently fastened together, and that it was laced crooked and was too loose, raised the issue of negligence in allowing the belt to be laced crooked, which caused it to jump.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 861–876; Dec. Dig. § 264.*]

4. APPEAL AND ERROR (§ 1033*)—HARMLESS ERROR—INSTRUCTIONS.

Where the charge was favorable to defendant, although it submitted several undisputed issues, it was without injury.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4052–4062; Dec. Dig. § 1033.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

On Motion for Rehearing.

**5. MASTER AND SERVANT (§ 217*) — ACTION FOR INJURIES — ASSUMPTION OF RISK — MACHINERY.**

Plaintiff, who was employed in and about a cotton gin, was familiar with the situation of the gin stands to each other, knew that a belt was laced crooked causing it to jump while passing over the pulley, and that to reach and oil the journal he would have to put his hand between the belt, and who had done some of the lacing himself and knew that the belt was laced crooked and that it jumped on the pulley, and had charge of small and temporary repairs, had his arm injured while reaching it between the belt to oil. *Held*, that he had assumed the risk and could not recover.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*]

Appeal from District Court, Grayson County; W. M. Peck, Judge.

Action by John Neff against the Sherman Oil Mill. Judgment for plaintiff, and defendant appeals. Reversed, and judgment rendered for defendant.

J. F. Holt and Head, Smith, Hare & Head, all of Sherman, for appellant. E. J. Smith, of Denison, and Freeman & Batsell, of Sherman, for appellee.

RAINEY, C. J. Appellee instituted this suit against the appellant to recover damages for personal injuries received by him while engaged in working in and about a cotton gin as an employé of appellant, while it was being operated in Sherman, Tex. In substance he alleged that he was working around certain gin stands engaged in oiling them, and in the performance of his duties it became necessary for him to place his right hand between and near a certain moving belt that operated the gin stands, and that while so doing the sleeve of the jumper he was wearing was caught by said belt, and his arm drawn in between said belt and the pulley on which it worked, and that his arm was so injured that it was necessary to amputate the same. Among a number of grounds of negligence alleged was the following, which was submitted by the court to the jury: "(3) The said belt, through or behind which plaintiff reached, was old, rotten, defective, dangerous, and unsafe for the purpose for which same was being used; was negligently, carelessly, and improperly fastened together; that it was laced together, laced crooked, and was permitted to be and remain too loose." That the condition of said belt was known to appellant and was unknown to appellee. Appellant answered by general denial, pleaded assumed risk and contributory negligence, and especially that at the time and place of injury appellee was the representative of appellant in the immediate charge of said gin stands and machinery, and appliances in connection therewith, and was familiar with the same, and it was his duty as such representative, or

foreman in charge thereof, to take notice of the condition of said machinery and appliances, and if the same became defective, or out of repair, it was his duty to repair the same, or in case the repairs were of such nature that he, as such foreman, could not make, it was his duty to report the same to appellant. The cause was tried and resulted in a verdict and judgment in favor of appellee and against appellant for $7,500, from which this appeal is taken.

Appellant complains in its first assignment of error as follows: "The court erred in refusing to give to the jury defendant's requested instruction reading as follows: 'In this case you are instructed to return your verdict for the defendant.'" The proposition submitted under this assignment is: "Negligence must be shown by affirmative proof, and, to fix the liability of an employer for injuries sustained by an employé, his negligence must not only be shown, but such negligence must be proved by affirmative evidence to have been the proximate cause of the injury, and the evidence fails to disclose such negligence in this case."

The evidence shows that Neff was working with, and had charge of, the gin stands of appellant and was engaged in oiling them. On the west end of the gin stand on which he was injured there was, about three feet from the floor near the front of the gin stand, a pulley known as the saw pulley; it was about 14 to 18 inches in diameter, and the flat surface of the pulley was about 8 inches wide; that an axle about the same elevation as that of the saw pulley immediately back of it, and 4 or 5 inches from the outer edge of the saw pulley, was a smaller pulley known as the brush pulley. Still back of the brush pulley, and higher up, was an idler, which could be moved back and forth by means of a lever, and the machinery started or stopped, and the belt that operated the same tightened or loosened. The belt passed up through the floor, back of and over the top of the brush pulley, then under and around the saw pulley, then back and over the idler, and back through the floor. The gin was in operation and the belt was moving rapidly. The belt with which this gin stand was operated was laced together, and the ends were not laced straight, and the ends were a little ways apart, being held together by lacing something like lacing on a shoe. Appellee put his hand between the belts, over the brush pulley, for the purpose of oiling a bearing on the back side of the brush pulley, next to the gin stand, when the sleeve of his jumper was caught by the belt, or something, and his arm carried into the saw pulley, where it was injured. There were four gin stands placed side by side about five or six inches apart—so near together that Neff could not go between them while oiling—and in oiling he had to look

over the belt to see how to put the oil in the receptacle, and could not watch his arm while between the belts. The gin stands were new, having been installed at the beginning of that season, and had been in operation about one month, although they had not been run regularly and all together the time consumed in running would amount to about one day. Mullenix was foreman and in charge of the gin stands, and instructed Neff that oiling was necessary about every hour. Hard oil could have been used, which would have required replenishing every half-day. Neff had told Mullenix, if he would get 1½ feet of leather, he (Neff) would dress it down and glue it, and he said, "Go ahead and lace it until it stretches, and then we could fix it some Sunday." For the four gin stands one belt was used for the operation of each; two were laced and two were glued. It was common to use laced belts, but it was preferable to use glued ones.

Neff testified, in part:

· "I reached in between the belts and oiled this inside journal because that was the only way to get to it. I could not see where my hand and arm was, at the time I put my arm through to do this oiling. The belt was in my way, top belt. If I had only had one stand there instead of four, I could have seen, by stooping down. I could not see in this instance with the four stands there, because I could not get around to the end where I could look in there. I have never worked at a gin stand where I had to reach in between the belts and oil inside journal until I went to oiling these particular gin stands. There was a little crack down about one-half inch between the belt and the top part that sets right over the brush where I could see the inside journal that I was attempting to oil to see if the oil was going inside the journal. I would stand back behind the saw pulley, put my arm over the little pulley, my oil cup in my right hand, and then bend over the top of the saw pulley and look down through a little crack on the far side of the pulley belt and see where the oil was striking—put my right hand down like that—and peep over. There was no other way by which this oil cup could have been filled without going between the belt as it was constructed, at that time. There was a way that it could have been constructed so that I could have oiled it without going between the belt. You could have sawed that part off a little there right behind the gin stand; that is, the part that sets over the brush. I would have sawed off about four inches of that board, then you could have put a hinge on the board, and when I wanted to oil the inside journal, pull that piece of board back and reach over the belt. It would not have been necessary to go between the belts at all. Then the board when I finished oiling would go right back in place. It would have cost about 40 or 50 cents, I think, to do that. I was reaching through there to oil this cup, and that belt caught my jumper sleeve and jerked it around into this saw pulley into the belt. I was reaching over this little pulley, which is about four or five inches from the big pulley, and my hand and arm was thrown under the saw pulley, and then it just tore it off, is all I know—ground my arm off. When my hand and arm was caught there between the belt and the saw pulley, it jerked me down against the frame of the stand. When it caught me, it just jerked me down against the frame of the stand and then wound my arm around that pulley until it tore the jumper off and then turned me loose—it turned me loose after it tore my jumper off; besides tearing my jumper, it tore my arm off; it just bursted it, tore all the bones out of it. I went to work for the defendant in 1909 at its gin stand and worked that season of 1909–10 attending the suction; just run the suction from the wagon that had the cotton in it. I guess I did that work about a month or such a matter, and then I went to tying out bales; that is, just putting hoops and ties around bales and tying them and rolling them downstairs. I stayed there at that work the rest of the season—the 1909–10 season. The season generally lasts about four months.

"When I went back to work in 1910, I started to running the gin stand, and continued in that work up to the time I was hurt. My recollection is that was in 1910. I started to work about the 1st of August—best of my recollection. I quit the season about the middle of January, then I went back to the same job in 1911, went back to work about the middle of August. We started operating that season about August 15th. I was hurt the 25th of August, 1911. When I started to work, Mr. Mullenix was working there too. I was working under him that season. I had charge of all four of the gin stands; they were placed side by side; they were lined up east and west. I was hurt on the west end of the east stand. I had no assistant and didn't have any during the season of 1910. The gin stands were new. They had been installed at the beginning of the season of 1911. The difference between the old stands and the new is that the new stand is longer than the old one, and that cut down the space in between the stands some. The space between the old stands was between a foot and a foot and a half. Between the new stands, to the best of my judgment, it was about six inches in the clear between those bearings. Each gin stand had a separate line shaft and had a separate belt coming up from below. I had never operated a gin stand where it was necessary to reach through the belt before. Those gin stands had only been operated a sufficient length of time to gin about 18 or 30 bales of cotton. That was all the experience that I had then in oiling the inside journal by reaching between the belts. Those four gin stands could gin between 20 and 30 bales in a day, steady running. Those gin stands

had not been operated all together more than one work day. Just before I was hurt, just like I was oiling this particular journal, I was oiling the rest of the stands. I had oiled the others. The other three stands to the west I had already oiled. I was oiling this one in the same way that I had oiled the other three. I was oiling this inside journal in the ordinary way—only way I seen to oil it. That belt went around in its circuit 200 times a minute, I expect; something like that. That lacing passed over this journal every time the belt went around it. * * * When the lacing at the union of the belt passes over the pulley, the thickness of the lacing is between the belt and the pulley at least to the width of the thickness of the lacing. When it is going so fast that way, and the lace hitting the belt has somewhat the appearance of a jump, that is what I speak of as a jump. * * * I think that my sleeve might have gotten under the belt and over the pulley at that jump. I don't know what other way my sleeve might have gotten under the belt and pulley except for the jump. I didn't know at the time of my accident that belts that are laced jump some. I know now that all belts that are laced will jump as they go over the pulley. I know now what causes the belt to jump. The lacing causes it. It is the thickness of the lacing under the smooth surface of the belt. When the lacing in the belt comes to the smooth surface of the pulley, that causes it to jump."

Appellee further testified on cross-examination that he was running the four gin stands under the superintendency of Mullenix, and if anything went wrong that he saw he was to report it or fix it himself. So far as he knew, there was nothing the matter with the belt. After a belt has been used awhile, where laced, it will widen some and be more liable for the corner to catch and cause trouble. The belt was pulling the gin all right, and there seemed to be no necessity for fixing it at once.

### Conclusions of Law.

[1] Counsel for appellant states a correct principle of law when they say that "negligence must be shown by affirmative proof, and to fix the liability of an employer for injuries sustained by an employé his negligence must not only be shown, but such negligence must be proved by affirmative evidence to have been the proximate cause of the injury." Does the evidence in this case meet the requirements stated? We are inclined to think so.

[2] It is the duty of the master to use ordinary care to provide his servant with a safe place in which to work and to provide safe appliances and instrumentalities with which to perform his labors, and the servant can rely on the assumption that this has been done by the master. If this duty of master has not been performed, and the servant knows of it, and the risk attending it, or in the ordinary performance of his duties must necessarily have acquired such knowledge, he assumes the risk and cannot recover. Here the master knew that he was running his belt laced crooked, which would cause it to wabble, he knew that the receptacles for receiving the oil were so placed that the servant would have to place his hand between the belt to oil the machinery, and that said receptacles were not fixed so they could be replenished with oil without the belt obstructing the sight of the servant in doing this work so he could not observe his arm when placed between the belt, and in placing the gin stands so near together as to prevent the servant from safely doing the oiling. Under these conditions, can it be said that the evidence does not show negligence of the master that proximately caused the injury to appellee?

The jury have said it was negligence in the master, and we do not feel authorized to say the evidence does not warrant such a finding. As was said by Justice Fly in Railway Co. v. Udalle, 91 S. W. 330: "Whether the master is negligent or not in furnishing a certain appliance, and whether or not knowledge of its defects had been brought home to the servant, are questions which generally must be submitted to a jury for their determination, and when there is evidence to justify a finding of the jury the appellate court must be bound by that finding on the facts. Every case must necessarily be decided on its peculiar facts. The character of the appliance, the circumstances surrounding the servant during its use, the length of time of its use—all must have their force and effect in determining the knowledge of a defect upon the part of the servant. The jury has the authority in the first instance to pass upon the evidence, and, as before stated, their verdict will not be disturbed if the circumstances taken together justify their conclusion; and it will thus arise that decisions of courts, in cases where the facts are similar, seem to be in conflict. The appellate court, in the absence of error of law, must justify the finding of the jury if the evidence will admit it; and it is undoubtedly the case that verdicts are often approved because of the foregoing rule, and not because the court has the same view of the facts as that evidenced by the verdict. Keeping the rule in view, it is easy to understand some of the seeming incongruities of opinion on fact cases."

The second assignment of error is: "The court erred in refusing to give special charge No. 1, requested by defendant, because the undisputed evidence shows that plaintiff was a man of mature years, and was experienced in the work in which he was engaged at the time of his injury; that he had, or in the ordinary circumspection of his work must nec-

essarily have had, full knowledge of all the defects and dangers which, in any manner, caused or contributed to cause his injury; and he therefore assumed the risk thereof, and could not recover." The following proposition is submitted under this assignment: "Neff was of mature years; was experienced in operating gins; had assumed the duty of looking after and keeping in repair the gin machinery where he was hurt; knew that the belt near which he was working was laced and laced crooked; knew the effect of the movements of the belt being laced in the manner it was; its condition, movement, and the dangers arising therefrom were more apparent to him than any one else; and he assumed the risk of danger therefrom." Appellee did not assume the risk, because he was in charge of the gins, and he was to report anything he saw wrong. He had not worked at gins before this where he had to put his hand between the belt and where he lost sight of his arm while performing the work of pouring the oil. While he knew of the way the belt was laced, he did not know of the danger attending the work as shown by the evidence. He was under no obligation to inspect, nor were the defects so obvious and patent as that he must of necessity have known thereof in discharging his duties, nor was he warned by the master of the danger in the work. Railway Co. v. Patrick, 50 Tex. Civ. App. 491, 109 S. W. 1097; Schow v. McCloskey, 109 S. W. 386. If a servant knows of one defect, he does not take the risk of another of which he has no knowledge, and if both contribute to injure him he is entitled to recover; provided, but for the unknown defect, the accident would not have happened. Railway Co. v. Somers, 78 Tex. 439, 14 S. W. 779.

The appellee was ordered by the foreman to oil the gin, and it was necessary for this to be done that he should run his arm between the belt, and he had the right to assume that he would not be exposed to unnecessary peril, and that there was no danger. Marshall v. Railway Co., 107 S. W. 884; Machine Co. v. Bennett, 141 S. W. 156. There was no error in refusing the charge.

The third, fourth, and fifth assignments show no reversible error, and the same are overruled.

[3] The sixth assignment of error complains of the sixth paragraph of the court's charge, which relates to negligence, if any, of defendant in allowing the belt to be laced crooked, which caused it to jump, etc.; the objection being in substance that the pleadings do not raise such an issue, that there is no evidence to support it, and that it is on the weight of the evidence. None of these objections is well taken. The pleadings of plaintiff charged a defective belt, and the jury, under the evidence, were warranted in finding that it was defective. The charge

is not subject to the criticism of being on the weight of the evidence.

The seventh assignment of error complains of the refusal of the court to give a special charge, which in effect tells the jury that the crooked lacing of the belt was not the proximate cause of the accident, and to find for defendant. This charge was upon the weight of the evidence and should not have been given, as the manner of lacing the belt was a controverted issue as to being the proximate cause of the injury, and was under the evidence a question for the jury.

[4] The eighth assignment complains of the seventh paragraph of the court's charge, in that so many undisputed issues are submitted, that the real issues are obscured and had the effect to burden rather than enlighten the jury. While some of the issues were undisputed, the charge was favorable to appellant. No special injury to appellant is pointed out, and no harm, at most, resulted to appellant.

Several other assignments are presented by appellant. We have duly considered them all, but have found no reversible error.

The judgment is affirmed.

### On Motion for Rehearing.

[5] On a former day of this term of court we affirmed the judgment in this cause on the theory that the facts showed a combination of circumstances that the jury were authorized to find that appellant was guilty of negligence in operating its gin stands, and that appellee was not aware of the danger, and therefore did not assume the risk in managing the said operations. Upon reconsideration of the evidence, and especially that of the appellee himself, we have reached the conclusion that we erred in affirming the case on the former hearing. The testimony of appellee showed that he was perfectly familiar with the situation of the gin stands with relation to each other; he knew that the belt was laced crooked, that it worked in and out, and that the lacing caused it to jump when passing over the pulley, he knew how the receptacle for the oil was placed, and that he would have to reach his hand between the belt to fill the cup with oil. While he was under a foreman, he had charge of the operations of the gin. He testified that: "I had done some of that lacing myself. I have done pretty near all the belt lacing last year and this. It (the belt) was laced in the usual way. The belt was laced crooked. I mean by that I noticed the belt wasn't going straight. The two ends were not cut straight. One was cut at a slant. I noticed that right after it started up. I noticed it as it jumped in and out on the pulley where the lace would catch it. The belt would not work off the pulley, but just work out, and when it would hit it would come back again. It just worked in

and out. Just after we started up, I noticed it, and it kept up until the time of the accident. I have care of the stands too while we were not running; when we would have no cotton to gin and shut down the machinery temporarily, I would generally fix one thing and another. I would look around the machinery generally, sort of like an engineer would his engine, and see that everything was in order; see that nothing was getting out of fix or getting loose that needed tightening up. If I found anything out of order, little things around there, I would fix it."

In our first opinion we said: "While he knew of the way the belt was laced, he did not know of the danger attending the work, as shown by the evidence." Also: "If a servant knows of one defect, he does not take the risk of another of which he has no knowledge, and if both contribute to injure him he is entitled to recover, provided, but for the unknown defect, the accident would not have happened."

Appellee was an experienced person, 28 years of age, and from his testimony we must conclude that all the defects of which he insisted contributed to his injury were known to him, and it is inconceivable that he did not know of the danger of placing his hand between the belt when the gin was running. It was unnecessary for him to take any such risk when he could have the engineer to stop the gins, or he could have stopped either gin separately by dropping the idler. He could have stopped the gin which he was oiling, thereby taking no risk of injury from the laced belt.

When the evidence about which there is no serious conflict is considered, we are of the opinion that it fails to show any liability on the part of the appellant, that the motion for rehearing should be granted, and the judgment be reversed, and, as the case seems to be fully developed, judgment should be rendered for appellant, and it is so ordered.

### On Motion for Rehearing and Additional Findings of Fact.

We are asked by appellee to find as a fact that he did not know the danger attending the putting of his hand between the belt while the gin was in operation. It is true that he testified he did not know the danger; but we are of the opinion, when all of his testimony is duly considered, that it shows he was perfectly familiar with the operation of the gins, acquired by long experience in their operation, and the danger of putting his hand between the belt was so apparent that he must of necessity have known of the danger, and is therefore chargeable with knowledge thereof.

The motions are overruled.